Please call the first base. 09-1291 William Clark-Lannert v. Illinois Central Railroad Co. Good morning, Your Honor. Good morning. May it please the Court, my name is Steve Scott, and I represent the defendant and appellant, Illinois Central Railroad Company. On May 4, 2006, the plaintiff brought this action against the defendant under the Federal Employer's Liability Act and the Federal Safety Appliance Act for alleged injuries he sustained while working as a conductor for the defendant on October 10, 2005 at Defendant's Glen Yard in Chicago, Illinois. During the course of litigation, the plaintiff filed a motion for partial summary judgment on the Federal Safety Appliance Act, which was granted by the trial court on May 7, 2009. In doing so, the trial judge granted the defendant Rule 304 language, which is why we're before you this morning. On October 10, 2005, the plaintiff was employed as a conductor working for the defendant at the Glen Yard in Chicago. One of the job assignments for the plaintiff and the two other members of his crew that day were to move or switch certain cars out of Track 4 at the Glen Yard. The plaintiff and the crew members proceeded out to Track 4. Once they got there, the plaintiff determined that he needed to couple or connect two train cars together. The train car WC84867 was already attached to their locomotive, and the other train car was several car lengths away. The plaintiff dismounted the locomotive and walked to the train car that was several car lengths away. At that point, he successfully opened the knuckle of that other train car. The knuckle of a train car sits at either end of the train car. The knuckle is used to couple or join up train cars. The knuckle has what's called a pin lifter that extends out from the end of the knuckle to the corner side of the train car. And the purpose of the pin lifter is so that an employee, a railroader, can walk alongside adjacent to the train car and simply pull the handle of the pin lifter, which in turn operates a mechanism which opens the knuckle. The plaintiff was successful in opening the knuckle of that train car. He then walks back to the locomotive and the train car, which is attached to that locomotive, and it determines that that knuckle is closed. The plaintiff admits, and it's been established, that two train cars can be coupled together if one knuckle is open. The plaintiff had already successfully opened the one knuckle. Still, he decided to... Well, counsel, I mean, if he could try and get both open, would that not be the logical thing to do? Why settle for half a loaf? Well, I would argue that it wouldn't be a half loaf because he's already done what needs to be done to couple the train cars, opening the one knuckle. Let me rephrase it slightly. What's there to preclude him from doing what he did? I mean, your point is that he was negligent or that the jury could find him 100% negligent in attempting to open the coupling device of that second car. But is there any rule that precluded him from doing it manually? No, there's no rule that... So if there's no rule that precludes him from doing it manually, how can you say that doing it was negligent when he could be thinking half a loaf? And 100% negligent at that, right? Correct. I would answer that it's because it wasn't necessary to effectuate the coupling that he wished to perform. Well, what's the legal question before? What was the legal question before the trial judge in granting partial summary judgment? And no reasonable jury? Well, the question before the trial judge was, number one, whether or not the pin lifter mechanism, the broken lock lift mechanism, violated the regulation. And there's no dispute about that, is there? There's no dispute that there was a broken lock lift mechanism. And? Number two, violation of the Safety Appliance Act. All right. But in order to grant summary judgment, in order to deny the defendant summary judgment, or the plaintiff on that point, she would have to say that a reasonable jury could, in fact, attribute 100% negligence to him by the acts that he undertook. That's correct. And you think that's a reasonable jury could come up to that conclusion? I do, and it's not just only because he decided to open the second knuckle. Let me ask you this. Do you think that happens frequently? Do you think that happens at all? The opening of a second locking device, the knuckle, on the second car, when it's not necessary to open it because you can force it open by pushing one car into the other. But do you think it happens? I don't have any statistics whether it happens. Take a wild guess. I do know that in the Romero case that was cited by opposing counsel, Mr. Romero attempted to couple the two cars with only one knuckle being open, and it wasn't until those two didn't couple that he took additional action. Well, then why don't we take that experience as suggesting maybe the plaintiff in this case had that very same experience in the past and said, you know, I've tried it before that way. It hasn't worked. I'm going to skip that step and go directly to opening it manually. Seems reasonable, doesn't it? Doesn't seem unreasonable. Right. It's a better way to phrase it. Well, I would say that in conjunction with the manner in which he attempted to open the second knuckle, his stance and the technique in opening the knuckle would be considered unreasonable. Counsel, I'm just curious. Had he not attempted to open that second knuckle, would you not be here in court saying that he was negligent for failing to complete the task? Under that hypothetical? I don't believe we would be. We don't know if the two would have coupled with only one knuckle being open. If the two would have coupled with only one knuckle being open, we likely wouldn't be here because Mr. Hardlander and his crew would have moved on with their day. Go on. Mr. Hardlander gets to the second knuckle of his train car, WC84867. And it's at this point that Mr. Hardlander takes the following stance to attempt to open this knuckle. He faces the end of the car and he puts his left hand out towards a pin lifter handle and the right hand out towards the knuckle. Now, this is his first attempt, not his second attempt. His left foot is on the outside rail, outside the rail. His right foot is inside the rail. So he's standing like this, at which time he attempts to open the knuckle. Now, we have asserted that that's in violation of railroad rules, prohibiting that stance when opening knuckle. In fact, the very purpose of the pin lifter and the pin lifter handle is so that a railroad employee can walk adjacent to a train and simply pull the pin lifter handle. And the reason for that is so that they don't have to step foot inside the knuckle. But the testimony is that this conductor had been there since 1999, that that was the way he was trained, that's the way he'd always done it. Simply saying that that's the way he's always done it doesn't mean that it was the proper way to do it. And that's the way he was trained to do it as well. That was his testimony that he learned from other coworkers, correct. So the first time he attempts to do it, the knuckle does not open. So then he does it a second time. Now, after the first time, he says he feels something, he feels a jolt. Now, he hasn't alleged that the lock lift mechanism broke after the first pull. So he takes the same stance again and pulls in the same manner again. At which point the lock lift mechanism falls to the ground near where the knuckle is located and he claims that he suffered a back injury as a result. He doesn't claim that the lock lift mechanism came in contact with his foot, his leg, and it fell to the ground. The lock lift mechanism is located three to four feet away from where he would be if he was adjacent to the track pulling the pin lifter handle, as we assert he should be. There's a valid defense under the Federal Safety Appliance Act, is we've been discussing already that plaintiff's own negligence was the sole cause of his injuries. I cite in my briefs the Walden case and it asserts that the Walden case asserts that same premise. Now, you can say, I believe that a reasonable jury could conclude that Mr. Harlander's actions by I think somebody turned his left arm akimbo, his right arm akimbo, standing like this, pulling on the pin lifter handle, pulling on the knuckle, led to his back injury. Not any lock lift mechanism falling to the ground. In fact, our expert, Ralph Barnett, has opined that the structural integrity of the lock lift mechanism in Coupler is unrelated to the safety of the Coupler operator in this case, Mr. Harlander. Say that again. The structural integrity of the lock lift mechanism. In other words, that it wasn't broken. No, no, not arguing that it wasn't broken, that it didn't matter whether it was broken or not. Correct. Because of its location and where Mr. Harlander would have pulled the pin lifter handle if he was doing it in the stance and technique that he should have, he would have been away from it, and the pin lifter handle, the turning radius is I believe six to eight inches, and that doesn't change if the lock lift mechanism breaks. Because it simply rotates. There's no testimony that the metal bracket that attaches the pin lifter handle and the pin lifter to the side of the train car is... Let me ask you this, assuming there is some sort of rule against the stance that he took, akimbo, akimbo, right, in trying to open things up, is this the kind of injury, is this the kind of employee injury that that rule was designed to protect from? Yes. Do you understand what I'm saying? A back injury? Correct. If you take a... What evidence do you have for that? Or what do you cite for that proposition? Well... Anyone testify to that? Ralph Barnett opined that the... We're talking about the rule, not the stance, but the rule itself. What was it meant to protect that says that that stance that he took was in violation of? Well, there's... Something much more severe than a back injury, I would think. Well, to keep... One of the purposes is to keep the feet clear and free from the knuckle, in case the knuckle or parts fall. So where do you get that from? You get that from the rule itself. Correct. So it says this rule is meant to protect an employee from possibly being injured in the event the knuckle falls and hits his feet. Where do you get the other proposition from, that it was also meant to protect against back injury? I think that I don't have a... It's assumed within it? Is that what you're saying? It falls within it? Correct. And there's also a life safety rule that provides that you're supposed to take the... Perform the safest method when pulling a pin lifter handle and operating a knuckle. And do you know whether Illinois Central trained its employees or told its employees that they should not take that stance because they could injure their back? Anything like that come up? I know that in the life safety rule books, as I said, they use the safest method when operating the pin lifter handle, and no testimony has come out other than that. I would argue that it would be somewhat common sense that if you, instead of pulling a pin lifter handle with one arm while you walk adjacent to a train car, is a much safer proposition than extending both arms out and leaning forward and pulling it in that manner. Counsel, we're going to have to give your opponent some time, but I'd like you to address the issue about the train car not being in use or being in use. The case that I cite is the Phillips case from the Fourth Circuit that provides a multifactorial test regarding whether or not a train car is in use under the Safety Appliance Act. The multifactorial test is where the train was located and the activity of the individual at the time of the incident. In this case, Mr. Harlander was a member of a switching crew. He was working at a yard and was not preparing any train for immediate departure. And it's my argument that, similar to the finding of the Phillips case, that a train car was not then in use under the Federal Safety Appliance Act. Just the location. I'm sorry. Just the Phillips being a per curiam opinion, should that come into play at all in terms of whether we should find it persuasive? I don't believe so. Plaintiff, and I understand that plaintiff has cited case law that has criticized Phillips, but several of his cases are unpublished opinions. But the one case that is published is the Federal District Court case that I criticized. I think it was the one that said it belied common sense. And it was Romero. Yeah, it contravenes logic and common sense to read the FSAA as the way Phillips did. And that's what I was going to ask about, because he discusses Romero, but in your reply brief you really don't put forth, you know, two different lines of cases and saying Phillips is the better reasoned line of case that we should follow. You sort of just ignore it. It might not be the best way to go. Because it seems to me that if it's a per curiam case, I think you need more than just an F3 site to get us the following. All right. I would simply say that Phillips, while it's been criticized, remains good law in the force. In the force. Yeah. All right. Thank you. Thank you, counsel. I'll leave. Good morning. My name is Ryan Brennan. I represent William Hardlander. I'm going to try to be brief. I'm going to try to basically respond to the arguments put forward by the defendant. There are two arguments before the court now, and I refer to one of them as the sole cause argument that's made by the defendant, and the other is the end use argument that's being made by the defendant. I'm going to address the sole cause argument first. I think what the court needs to keep in mind is the FLA's extremely lenient causation standard, and I think that's really what's in play, and that's one of the big issues that the defendant has brought before the court. Under the FLA, the plaintiff needs to show that the negligence of the employer, the Illinois Central Railroad, played any part, however slight, in the injury that's the subject of the suit. Mr. Hardlander has met his burden in that regard. He's come forward with sufficient evidence to show that the defendant's negligence, in this case a crack and defective coupler mechanism, caused or contributed to his injuries. He's done that a couple of ways. He's done that in his own direct testimony, which has been uncontroverted when he's operating this pin-lifting mechanism. The component failed. He felt immediate pain in his back. He's put forward evidence by the railroad's senior mechanic supervisor. Was that Schweitzer? Yes, sir, it is. Anthony Schweitzer testified that this component that's at issue in this case was cracked prior to the date of incident. What exactly did he say? He said that the crack preexisted October 10, 2005. He testified that the lever that is a part of the uncoupling mechanism broke free as a result of that defect, and when that component, the lock lift, sheared, it would cause the handle to break free exactly as Mr. Hardlander testified to. As he was pulling it? Yes, sir. And if you'll excuse me for a moment, if you look at the record from the trial court in Exhibits 6 and 10, which were attached to the Motion for Summary Judgment. Yes, sir. No displays in public court. You can refer to the exhibit. Thank you. I think they're found in the record in Volume 2, Pages C-4 through C-59, as exhibits, but the pictures themselves are worth more than 1,000 words. You can see this defect. It's not an issue. All right, counsel, but let's address whether or not the issue should have been taken away from the jury. And, of course, I think there's language. I can't seem to find it right now, but there's language from a U.S. Supreme Court case that talks about it's the rare case, the very rare case where an issue should be taken away from the jury. And I'm sure you're very familiar, as plaintiff's counsel, that you don't want issues taken away from the jury. You want to be able to present it to the jury and let the jury decide as far as the fact. Well, doesn't the same concerns apply when summary judgment is filed by the plaintiff and the defendant is entitled to that very rare instance sort of benefit, that it should be a very rare case that an issue should be taken away from the jury? But that's exactly what happened here. And why should we find this case to be one where it is such a rare case? Well, Your Honor, I think that in this particular case, a reasonable fact finder could conclude that the negligence of the railroad, in this case the defective coupling mechanism, did not cause or contribute to his injuries. It's a very low burden, and the plaintiff's met it in this case. Now, the railroad has argued, what the railroad has essentially argued, is contribute to our negligence. They've strung together a bunch of allegations that Mr. Hardlander himself was negligent, and his negligence was the sole cause of his injury. But that argument fails for two reasons. The first reason is this is a violation of a federal safety statute. Under the FPLA, a violation of a federal safety statute. Well, then let's go to Warren. Certainly. Where there was a per se negligence finding. Case goes before the jury, and the jury finds against the plaintiff. And it's upheld by the Seventh Circuit. I mean, isn't that sort of the same situation we have here, where you have a very strong case that the defendant is negligent and your client is not 100% negligent, certainly. But before a jury, it could come out against you. Your Honor, this case is different from Walden. In Walden, what the court ruled is that the same injury could have occurred absent the Safety Appliance Act violation. That is not the case here. This incident would not have happened. Mr. Hartlander would not be injured but for that safety appliance breaking. So this case is clearly distinguishable from Walden. I know that the defense relies heavily on Walden and argues that it's the same, and they want to muddy the water and confuse the issue. But in the final analysis, this case is different because the Safety Appliance Act violation directly caused the injury that wasn't the case in Walden. So a jury cannot come to the same conclusion in this case as it did in Walden. So I think the cases are different. This is a Romero case. Absolutely. No reasonable finder of fact could come to the conclusion the reveler would have the court come to. They're asking the court to make an unsupported leap in this case. So let's go back to what Judge Brewer did, and would you give us your best argument as to why she was correct as a matter of law in ruling on the motion? Certainly. It's uncontroverted that the Safety Appliance Act was violated and the Code of Federal Regulations was violated. Once that happens, the burden then shifts to the defendant to put forward evidence that calls the causation into question. The evidence in this case is so clear that this component failed and that failure caused or contributed in any part to Mr. Harlanda's injuries that no reasonable finder of fact could come to an alternate conclusion. That is why Judge Brewer was correct, and that's why I think that this Court should affirm her ruling on that portion of the plaintiff's motion. The second argument that the defense puts forward is this in-use argument, and they rely on Phillips v. CSX, and the Court's read the briefs, obviously, and has asked some pretty poignant questions, so I'll try to be brief. But it's plaintiff's position that the Phillips Court's interpretation of the ruling of Seaboard was an incorrect reading of that ruling. What the Seaboard case said is the train brake requirement of the Safety Appliance Act does not apply in switching operations, but the Safety Appliance Act deals with two different kinds of vehicles, if you will. It deals with trains as a whole, and that portion of the Safety Appliance Act requires power train brakes or automatic brakes. It also deals with railcars. It calls them vehicles, and railcars have been interpreted by the courts to be those vehicles. It requires vehicles to be equipped with efficient handbrakes and efficient couplers. The coupler provision absolutely and by necessity applies to switching operations, a point that the defense would have the Court disbelieve. To take the position that the automatic coupler provision doesn't apply to switching operations, and I'm going to quote the Romero Court, contravenes logic and common sense. A trainman, such as Mr. Hardlander, only uses couplers during switching operations. So the assertion that that portion of the Safety Appliance Act doesn't apply to switching operations is frankly absurd. The Phillips case misread Seaboard. I've cited a lot of cases in my brief. The weight of authority on this issue is clear. Phillips came to the wrong conclusion based upon a misinterpretation of Seaboard. The automatic coupler requirements of the Safety Appliance Act absolutely applies to switching operations. So I think that Judge Brewer is also absolutely correct in determining that as a matter of law, that provision of the Safety Appliance Act is violated, and that's why I asked the Court to affirm her ruling on that point as well. All right. Just to be clear, Rob, to the extent that we read Seaboard differently than Phillips, we're bound to follow Seaboard and not Phillips. Well, Your Honor, I would call the Court's attention to the opinion in U.S. v. Erie Railroad Company, and that's a U.S. Supreme Court case from 1915, and in that case, the Court expressly states that the cover provision of the Safety Appliance Act applies to switching operations. And so I think that is the law that this Court should follow. The Supreme Court has been very clear on that issue. And so to the extent that we're bound to follow both Seaboard and Erie, we don't have to rely on Phillips to interpret Seaboard for us and follow its interpretation of Seaboard. That's correct. Well, Your Honor, I think that... But do we have to actually pull the trigger and say Phillips was wrongly decided, or can we simply distinguish it? I think you can distinguish it, Your Honor. How? Well, I think, frankly, that logic dictates that the... Well, that's not distinguishing. Well, Your Honor, I can distinguish it, because the cases deal with different provisions of the Safety Appliance Act. One deals with trains and one deals with vehicles, and it applies a separate portion of the statute to each separately. Any other questions from the Court? I'm still trying to further directly understand your argument as it applies to... What makes you think that that vehicle was in use? Your Honor, during switching operations, rail cars are by definition, I think, in use. It's not moving, it's not getting ready to move, it's just sitting there. Why is it in use? It was being joined together with other cars, Your Honor, and for a rail vehicle, which is a rail car, that puts it in use. The coupler provision of the Safety Appliance Act applies to those very switching operations. It's not a train in use, which is what the Seaboard case deals with when it talks about the train brake work requirements. It wasn't a train in use. I will concede that, but it was a vehicle in use. What use was it being put to? It was being coupled with other cars to form a train. That's switching operations, Your Honor. But it wasn't functioning as a vehicle. It wasn't carrying anything. It wasn't moving on its own. Where is the use? I think just by the sheer fact that it was being joined together with other cars to form into a train puts it in use. I don't think there has to be any testimony that it had any particular cargo on board or anything else. I think the sheer fact that it was involved, that vehicle was involved in switching operations brings the coupler provision of the Safety Appliance Act into play. Let me suggest this, that to the extent that cars cannot be in use except when already coupled to another car, which in turn are coupled to the locomotive, which makes it a train, we would have to limit the federal safety or federal appliance safety, whatever that is, to just trains. Because to the extent that there are vehicles and trains, and trains are coupled and vehicles are uncoupled, to the extent that you have two different units, as the Supreme Court addressed them, you have to have in use, meaning different stuff, when you have different units in use. In response to that, Your Honor, when cars are being switched in a rail yard and they're cut free from the train and there's a single car, let's say it's on a slope, standard procedure would be for trainmen to go out and to set the handbrakes on that car to keep that car from rolling. Now that car is not being moved. It's not being joined up with other cars. It's not being pulled by an engine. And it certainly is not a train. However, the Safety Appliance Act applies to those handbrakes. It's in the same paragraph as the automatic control provision. That car doesn't have to be actually doing anything. That's not a prerequisite. Any other questions from the Court? So it applies to the handbrakes. You say if they're using the handbrakes, that's what puts it in use? No, Your Honor. If it's sitting there doing nothing, no one is trying to couple it, no one is trying to put on the brakes to keep it from rolling away, is it in use then? Or is it necessary for something to have been done to it or is being done to it in order to make it in use for purposes of the statute? It does not have to have something being done to it. And, Your Honor, just so I'm clear, I was trying to clarify or draw a distinction between the different applications of the Safety Appliance Act. The portion of the Federal Safety Appliance Act that addresses couplers also addresses handbrakes. And handbrakes are brakes on each individual rail car that either have a lever or a wheel that a person working in a yard will manipulate to set the brakes on a car. The courts have clearly held that the handbrake provisions of the Safety Appliance Act apply to those cars even if they're way out on their own on the corner of a rail yard. So just stop right there. So you're saying the application of the handbrake puts the vehicle in use? That's what I just asked you. I'm sorry, Your Honor. It's in use for the purpose of the Federal Safety Appliance Act. When they're using that handbrake? Absolutely. And the same holds true. But if they're not using the handbrake and it's just sitting there, is it in use? Absolutely. Because the rules and the handbrakes were not efficient, the Federal Safety Appliance Act has been violated. But if nobody was applying the handbrake, it's not in use, right? The car by itself just sitting there. So you're saying that the application of the handbrake is analogous to the coupling of the two vehicles? Both provisions apply equally when the vehicle is being used for whatever purposes it is used for on the railroad. It is always required that these cars be equipped with efficient handbrakes and automatic coupling devices at all times. So you're saying it's the coupling that put the vehicle in question in use in this case? Absolutely. Okay, thank you. Thank you for your time. Rebuttal. A couple of things that plaintiff's counsel pointed out. Number one, he talks about the lock-lift mechanism and that. The breaking of the lock-lift, the broken lock-lift mechanism, means that somehow the defendant could not put forth that the plaintiff was solely negligent as a result. Well, I would argue that that is not correct, that the stance taken and the technique performed by the plaintiff in attempting to open the knuckle very clearly could have caused his back injury. And the first attempt to pull the pin-lifter the way the plaintiff did so, he said he felt something. He felt a little jolt. So obviously before the lock-lift mechanism was broken, Mr. Hardlander had already felt something. He had already felt some sort of pain. Also, plaintiff's counsel mentions that when he pulled the pin-lifter handle, it sort of flew up. Well, that's why I mentioned earlier that there's no testimony. In fact, Mr. Schweitzer testifies that there was no testimony or there was no defect in the bracket that holds the pin-lifter handle to the train car. So you're pulling a pin-lifter handle, and perhaps I didn't describe exactly how you pull the pin-lifter handle, but you just pull it like this. As I'm pulling it up, it only rotates about six to eight inches upwards. So this isn't pulling some sort of heavy object, pulling it hard. In fact, Mr. Hardlander's testimony is the first time he pulled the pin-lifter handle, he pulled it light and easy using moderate effort, and the second time he attempted to pull the pin-lifter, he pulled it the same if not, I'm trying to think of a good way to describe it, almost softer, less effort. So he clearly pulls the pin-lifter handle and pulls it the same way a second time. The rotation's the same whether the lock-lift mechanism is in place or not. It doesn't change the rotation of the pin-lifter handle. Thank you, counsel. Thank you both. This matter will be taken up.